## Commonwealth *vs.* Ramon Luis Vizcarrondo.

Hampden. January 8, 1998. - May 7, 1998.

Present: Wilkins, C.J., Abrams, Lynch, Greaney, Fried, Marshall, & Ireland, JJ.

*Practice, Criminal,* Instructions to jury, Capital case. *Homicide. Malice.*

At the trial of an indictment for murder in the first degree by reason of extreme atrocity or cruelty, the judge's erroneous instruction to the jury, defining the third prong of malice by reference to "grievous bodily harm," required that the defendant be granted a new trial, where the evidence could have warranted a finding of a risk of harm less than a plain and strong likelihood of death. [394-398]

INDICTMENT found and returned in the Superior Court Department on December 16, 1993.

The case was tried before *Judd J. Carhart,* J.

*David Duncan* for the defendant.

*Elizabeth Dunphy Farris,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendant, Ramon Luis Vizcarrondo, appeals from his conviction of murder in the first degree by reason of extreme atrocity or cruelty. He alleges that he is entitled to a new trial because of incorrect jury instructions on the third prong of malice. He argues that there is a substantial likelihood of a miscarriage of justice[1] because the instructions permitted a reasonable juror to infer malice on less than a plain and strong likelihood of death. We agree. Although we have not previously reversed a conviction for murder in the first degree on the ground urged by the defendant, we have said that "[i]n the appropriate case we might be moved to set aside a verdict based on [the] erroneous third prong malice instruction" at issue here. *Commonwealth* v. *Fuller,* 421 Mass. 400, 412 (1995). We conclude that a new trial is required.

---

[1]We review for a substantial likelihood of a miscarriage of justice because the defendant did not object to the instructions at trial. See *Commonwealth* v. *Burke,* 414 Mass. 252, 265 (1993).

1. *Facts.* We set forth the facts in the light most favorable to the Commonwealth. See *Commonwealth* v. *Salemme*, 395 Mass. 594, 595 (1985). Ten month old Lisa Santiago died in the early morning hours of December 7, 1993. At the time of her death, there was extensive bruising to her body. Several of the bruises were fresh. There were also human bite marks in several places on her body. She had multiple fresh rib fractures and a fresh spiral fracture of the left tibia. Her liver was lacerated and crushed. She suffered internal bleeding.

The medical testimony established that the cause of death was multiple blunt force trauma that required four or more blows to the body. The medical testimony also indicated that the baby may have survived her injuries for as long as one hour, and was likely conscious for some of that time. The injuries would have been extremely painful. Medical experts opined that the baby's injuries were not consistent with falling off a bed, falling to the ground with an adult, being hit in the abdomen by an adult's elbow as the adult tripped, or being dropped from an adult's arms.

At the time of her death, Lisa lived with her seventeen year old mother, Veronica Santiago. Together, they lived with the defendant, who was eighteen at the time, in the defendant's room in his mother's home. On the night of December 6, 1993, the defendant arrived home at about 11 P.M. While the baby slept in her playpen next to the bed, the defendant and Santiago lay in the bed and watched a television show. After the television show was over, they had sexual intercourse. The sexual relations ended when the defendant asked Santiago to perform a "very intimate" sexual act that she did not want to perform. Santiago then went upstairs to take a shower. The defendant remained in the bedroom with the baby. Approximately twenty minutes later, Santiago heard the baby crying, got out of the shower, and returned downstairs to check on her. When she returned to the bedroom, the defendant was on the bed leaning into the playpen, rubbing the baby's back. The baby was lying in the playpen, positioned so that her head was at the opposite end of the playpen from when her mother put her down to sleep. The baby was breathing as if she had been crying and was just calming down. The defendant told Santiago that the baby had awoken and that he was quieting her. Santiago returned to the shower while the defendant remained with the baby. Five to ten minutes later the defendant brought the baby

upstairs to her mother. The baby was limp and unresponsive. Emergency personnel were called and the baby was taken to a hospital, where she subsequently died.

The defendant did not testify at trial. However, statements he gave to the police, both before and after his arrest, were admitted in evidence at trial.[2] In two prearrest statements, the defendant told police that after Santiago went to the shower the first time, the baby awoke and the defendant tried to quiet her as he always did by "shak[ing] her butt" and saying, "shush shush." The baby was falling back asleep just as her mother returned to the bedroom, so the defendant told Santiago to be quiet so that the baby would not wake up again. After Santiago returned upstairs, the defendant began to get dressed so that he could go upstairs to join her. According to the defendant, the baby began to cry again, so he picked her up and put her on the bed "on her belly." She started to scream. He turned away to finish dressing. He then heard a "boom," looked toward the bed, and saw the baby on the floor. She was not moving or crying. The defendant picked up the baby and brought her upstairs to her mother.

After he was arrested, the defendant admitted to police that he squeezed the baby "a little bit," but not hard enough to kill her. He also admitted that he bit her arms twice. He denied responsibility for her death. The arresting officer told the defendant that his version of events was not consistent with the baby's injuries. The defendant changed his account. He stated that he picked up the baby from the playpen and put her on the foot of the bed. She fell from the bed, and as he reached over to pick her up, he tripped over a pile of clothes, and the two of them fell. The defendant said that the baby must have hit her stomach against the wooden edge of the bed.

The arresting officer told the defendant that this account was still not consistent with the baby's injuries. The defendant then told the arresting officer that as he attempted to lift the baby from the floor, he tripped over the bed, and his elbow landed on her stomach when he fell.

2. *Instructions on the third prong of malice.*[3] The defendant asserts that the judge's instructions on the third prong of malice,

[2]On appeal, the defendant does not challenge the admission of these statements.

[3]"Malice as an element of murder may be proved by evidence establishing any one of three facts beyond a reasonable doubt: if, without justification or

which we set out in the margin,[4] were confusing because the judge stated that "[m]alice aforethought may be inferred if from the circumstances known to the Defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death *or grievous bodily harm* would follow the contemplated act" (emphasis supplied). The defendant asserts that including "or grievous bodily harm" in the instruction improperly permitted the jurors to infer malice on proof that the defendant committed an act that he knew (or should have known) would result in grievous bodily harm. He argues that such proof is equivalent to the proof required for manslaughter, not murder. The defendant concludes that there must be a plain and strong likelihood of death to support a conviction for murder in the first or second degree based on the third prong of malice. We agree.

"We reject any suggestion that we have made something less than a plain and strong likelihood of death sufficient for proof

---

excuse, (1) the defendant intended to kill the victim (the so-called first prong of malice), or (2) the defendant intended to do the victim grievous bodily harm (the second prong), or (3) in the circumstances known to the defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act (the third prong). *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987)." *Commonwealth* v. *Sneed*, 413 Mass. 387, 388 n.1 (1992).

[4]The judge's instructions were, in relevant part:

"Malice aforethought includes an unexcused specific intent to kill or an unexcused specific intent to do grievous bodily harm or an unexcused specific intent to do an act which in the circumstances known to the Defendant would create a plain and strong likelihood that death would result.

"Malice aforethought may be inferred if from the circumstances known to the Defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death *or grievous bodily harm* would follow the contemplated act" (emphasis supplied).

The judge, thus, gave both a correct and an incorrect definition of the third prong of malice. We cannot say which the jury followed. See *Commonwealth* v. *Sneed*, 413 Mass. 387, 392 (1992). Although this case was tried more than fifteen months after our decision in *Commonwealth* v. *Sires*, 413 Mass. 292 (1992), neither defense counsel nor the assistant district attorney brought the error to the judge's attention.

of the third prong of malice."[5] *Commonwealth* v. *Sires*, 413 Mass. 292, 303 n.14 (1992). *Commonwealth* v. *Fuller*, 421 Mass. 400, 412 (1995). See *Commonwealth* v. *Judge*, 420 Mass. 433, 437 (1995). Malice is what distinguishes murder from manslaughter. See *Commonwealth* v. *Skinner*, 408 Mass. 88, 92 (1990). "Without malice, an unlawful killing can be no more than manslaughter." *Judge, supra.* "The difference between the elements of the third prong of malice and wanton and reckless conduct amounting to involuntary manslaughter lies in the degree of risk of physical harm that a reasonable person would recognize was created by particular conduct, based on what the defendant knew. The risk for the purposes of the third prong of malice is that there was a plain and strong likelihood of death. . . . The risk that will satisfy the standard for wilful and wanton conduct amounting to involuntary manslaughter 'involves a high degree of likelihood that substantial harm will result to another.' " *Sires, supra* at 303-304 n.14, quoting *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944).

A conviction of murder founded on a state of mind sufficient

---

[5]We have been clear in our view "that the third prong of the malice definition can only be satisfied by proof that 'there was a plain and strong likelihood of death.' " *Commonwealth* v. *Fuller*, 421 Mass. 400, 412 (1995), quoting *Commonwealth* v. *Sires*, 413 Mass. 292, 303 n.14 (1992). See *Commonwealth* v. *Murphy*, 426 Mass. 395, 401 (1998); *Commonwealth* v. *Fryar*, 425 Mass. 237, 248, cert. denied, 118 S. Ct. 636 (1997); *Commonwealth* v. *Semedo*, 422 Mass. 716, 720 (1996); *Commonwealth* v. *Brooks*, 422 Mass. 574, 580 (1996); *Commonwealth* v. *Johnson*, 422 Mass. 420, 427-428 (1996); *Commonwealth* v. *Morgan*, 422 Mass. 373, 382 (1996); *Commonwealth* v. *Judge*, 420 Mass. 433, 437 (1995); *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995); *Commonwealth* v. *Sneed*, 413 Mass. 387, 388 n.1 (1992).

On occasion, however, when the definition of the third prong of malice has not been directly at issue, we have included the grievous bodily harm language in our statement of the definition. See *Commonwealth* v. *Pierce*, 419 Mass. 28, 36-37 (1994); *Commonwealth* v. *Delaney*, 418 Mass. 658, 666-667 (1994). On other occasions, in cases challenging jury instructions on other grounds, we did not correct instructions that included the grievous bodily harm language. See *Commonwealth* v. *Sullivan*, 425 Mass. 449, 450-451 n.3 (1997); *Commonwealth* v. *Blackwell*, 422 Mass. 294, 297 (1996); *Commonwealth* v. *Torres*, 420 Mass. 479, 486-487 (1995); *Commonwealth* v. *Ferreira*, 417 Mass. 592, 597-598 & n.7 (1994); *Commonwealth* v. *Costa*, 414 Mass. 618, 627-628 (1993); *Commonwealth* v. *Brown*, 414 Mass. 123, 124-125 & n.2 (1993). These cases are not to be read to suggest that something less than a plain and strong likelihood of death is sufficient for proof of the third prong of malice.

only to support a manslaughter conviction violates due process. See *Carella* v. *California*, 491 U.S. 263, 265 (1989); *Skinner, supra* at 92. It is also inconsistent with the principle that criminal liability and punishment for an act should be proportionate to the actor's moral culpability for that act. See *Commonwealth* v. *Sneed*, 413 Mass. 387, 393 (1992); *Commonwealth* v. *Matchett*, 386 Mass. 492, 506-507 (1982). Here, the instructions permitted the jurors to infer malice solely from conduct that "involves a high degree of likelihood that substantial harm will result to another." *Sires, supra* at 303-304 n.14. Such an inference is insufficient to support a conviction for murder based on the third prong of malice. See *id.*

Unlike previous cases where we rejected challenges similar to the one raised by the defendant, see *Commonwealth* v. *Murphy*, 426 Mass. 395, 401 (1998); *Commonwealth* v. *Fryar*, 425 Mass. 237, 248, cert. denied, 118 S. Ct. 636 (1997); *Commonwealth* v. *Mello*, 420 Mass. 375, 390 (1995), here the evidence could have "warrant[ed] a finding of a risk of harm less than a strong likelihood of death." *Murphy, supra* at 401, quoting *Fryar, supra.* Although the injuries to the baby were severe and ultimately fatal, the injuries were not inflicted in a manner from which malice is ineluctably inferred. Cf. *Murphy, supra* at 401 (defendant stabbed victim in chest with knife); *Fryar, supra* at 248 (same); *Mello, supra* at 390 & n.14 (defendant fire-bombed six-family apartment building, which he knew was occupied, in the middle of the night). Unlike those cases, the evidence here could be viewed either as tending to prove a strong and plain likelihood of death or as tending to prove conduct that involved a high degree of likelihood that substantial harm will happen to another.

The Commonwealth relies on cases in which we have held that jurors may properly infer malice aforethought from a simple blow with the hand to a young child, even though such a blow to a healthy adult would not support an inference of malice. See *Commonwealth* v. *Hutchinson*, 395 Mass. 568, 579 (1985); *Commonwealth* v. *Kane*, 388 Mass. 128, 134 (1983); *Commonwealth* v. *Fratus*, 385 Mass. 551, 554 (1982); *Commonwealth* v. *Starling*, 382 Mass. 423, 426 (1981). The Commonwealth's reliance is misplaced. The issue here is not whether a simple blow to a young child is sufficient to permit an inference of malice. The issue is whether the evidence *required* the jurors to find a plain and strong likelihood that death would

result from the defendant's actions, thereby rendering the erroneous instruction nonprejudicial. Because the evidence permitted but did not require the jurors to conclude that there was a plain and strong likelihood that death would follow the defendant's actions, there must be a new trial.

As the Appeals Court recently stated, quoting *Yates* v. *United States*, 354 U.S. 298, 312 (1957), overruled on other grounds by *Burks* v. *United States*, 437 U.S. 1, 18 (1978), "[w]here, as here, 'the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected,' the verdict must be set aside." *Commonwealth* v. *DiRenzo*, 44 Mass. App. Ct. 95, 100-101 (1997) (conviction of delinquency by reason of murder in the second degree reversed based on the same error as here).[6]

3. *Conclusion.* The judgment is reversed, the verdict is set aside, and the case is remanded to the Superior Court for a new trial.

*So ordered.*

---

[6]The defendant also assigns error to the judge's use of the "frame of mind" language that we have said "is not helpful and ought in the future to be omitted." *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995). This case was tried before *Eagles* was decided. There was no error. On retrial, the judge's charge to the jury should comport with our decision in *Eagles*.